IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EUGENE S. EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1866 |
| | ) | Judge Terrence F. McVerry |
| JOANNE B. BARNHART | ) | Magistrate Judge Lisa P. Lenihan |
| COMMISSIONER OF SOCIAL | ) | Docket Nos. 8, 10 |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I.     Recommendation

It is respectfully recommended that the Plaintiff's Motion for Summary Judgement

(Docket No. 8) be denied, that the Defendant's Motion for Summary Judgment (Docket No. 10)

be granted, and that the decision of the Commissioner of Social Security to deny Plaintiff's

application for benefits and supplemental security income be affirmed.

II.     Report

Presently before the Court for disposition are cross motions for summary judgment.

A.  Procedural History

On April 16, 2004, Eugene Evans ("Plaintiff"), by his counsel, timely filed a complaint

pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §405(g) for review

of the Commissioner's final determination disallowing his claim for disability insurance benefits

under Sections 216(i) and 223 of the Social Security Act, as amended, 42 U.S.C. §§416(i) and 423.  The history of Plaintiff's claim is as follows:

On February 11, 2002, Plaintiff filed an application for Social Security disability benefits alleging that he had been disabled on or before September 30, 2000.[1]  A hearing was held on May 29, 2003, and benefits were denied by the Administrative Law Judge ("ALJ").  (R. at 256.)  In his August 23, 2003, decision, the ALJ concluded that although Plaintiff had a seizure disorder and borderline intellectual functioning, he was not disabled within the meaning of the Social Security Act.

Upon appeal, the Social Security Administration Appeals Council vacated the hearing decision and remanded the case to the ALJ with instructions to (1) obtain updated medical evidence from the claimant's treating sources; (2) give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of assessed limitations; and (3) obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base through hypothetical questions that reflect the specific capacity/limitations established by the record as a whole.  (R. at 261.)

The second hearing was held on May 27, 2004, after which the ALJ again concluded that Plaintiff is not disabled within the meaning of the Act.  The ALJ found that Plaintiff's "seizure disorder, borderline intellectual functioning, separated left shoulder and residual pain in his left foot secondary to a car accident are considered 'severe'," but that "[t]hese medically determinable

---

1.  To obtain disability insurance benefits, Plaintiff must show that he became disabled prior to his date last insured, which has been determined to be December 31, 1999.  (R. at  35.)

impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (R. at 20.) The ALJ also found that Plaintiff's allegations regarding his limitations were "not totally credible" and that Plaintiff is capable of "light work" within a limited range, potentially qualifying him for "a significant number of jobs in the national economy." (R. at 21.)

It is from this second decision that Plaintiff appeals. Plaintiff raises four issues before this Court: (1) that the ALJ and Appeals Council improperly disregarded the medical opinion of Plaintiff's physicians, Drs. Balestrino, Prenatt, and Eisler; (2) that the ALJ improperly determined that Plaintiff's allegations regarding his limitations were not totally credible; (3) that the ALJ improperly determined that Plaintiff has the capacity for light exertional work with additional restrictions without substantial evidence of each physical requirement; and (4) that the ALJ improperly disregarded the testimony of the vocational expert and relied on an incomplete hypothetical question.

B. Statement of Facts

Plaintiff was born April 17, 1966 and was 38 years old at the time of the ALJ's last decision. Plaintiff completed the ninth grade in school, attended special education classes during school, and subsequently obtained a GED. (R. at 306.) Plaintiff has been sporadically employed at a variety of jobs, including prep cook and laborer, but the ALJ found that he had no past relevant work. (R. at 20.)

In 1987, Plaintiff was struck by an automobile while he walking and sustained extensive physical injuries to his head, left hip and left leg. Following this accident, he was in a coma for 17 days at Allegheny General Hospital. (R. at 103.) Doctors at Allegheny General inserted a

3

metal plate and screws into his left leg to stabilize that leg; the plate remains in place to the present time.  Although Plaintiff recovered the ability to walk, he does so with a limp.

Plaintiff was admitted to Harmarville Rehabilitation Center on January 25, 1988 for a three month stay.  (R. at 225-239.)  During this time, he was given the medication Dilantin to prevent any possible seizures that might follow a head injury, although no seizure activity was then noted.[2]  (R. at 229.)

On August 2, 1999, Plaintiff presented at Butler Memorial Hospital reporting that he had been having seizures for the past eight months.  No seizure activity was witnessed in the hospital, and an EEG, CAT scan and blood work were all normal.  A hospital doctor prescribed Dilantin and referred Plaintiff to a neurologist.[3]  (R. at 154-157.)

Plaintiff asserts that he did not obtain further treatment or take medication for his seizures because he did not have insurance and could not afford either treatment or medication.  (R. at 99, 103.)  Plaintiff obtained medical insurance through the Department of Public Welfare in 2002 and had a single documented appointment with Dr. Balestrino, a family practitioner, on April 10, 2002.  Dr. Balestrino noted that Plaintiff had "a residual left foot weakness related to his [leg] injury ... but no other neurologic deficits based on his subarachnoid hemorrhage."  Based on patient's self-report, Dr. Balestrino diagnosed "probable pseudoseizures which are most likely related to his pedestrian accident and subsequent brain injury;" prescribed Depakote to prevent

---

2.  Plaintiff was instructed to have follow-up testing of his Dilantin level, but there is no record of his having done so.

3.  The hospital also notified the Department of Transportation, which resulted in the suspension of Plaintiff's driver's licence.  (R. at 157.)

seizures; and instructed Plaintiff to decrease alcohol use from 30 to 7 or fewer beers per week.[4]
Dr. Balestrino found Plaintiff to be "at least temporarily disabled" due to the self-reported seizure
activity and recommended follow up in three to four weeks.[5]  (R. at 172.)

According to the records of Dr. Davila, who examined Plaintiff for the Pennsylvania
Bureau of Disability Determination on May 14, 2002, Plaintiff began taking the Depakote in
early May, with a resulting cessation of seizure activity.  Dr. Davila noted Plaintiff's dropped left
foot; reduced rotation of the left hip; a draining puncture wound in his left leg; and self report of
previous seizure history.  Dr. Davila found Plaintiff was limited to 1-2 cumulative hours of
walking and standing in an eight hour day and was limited in his ability to operate foot controls
with his left leg.  (R. at 163-165.)

Plaintiff still reported no seizure activity six weeks later when he was examined by Dr.
Uran, a psychologist.  Dr. Uran's diagnosis of Plaintiff included cognitive disorder and NOS
mood disorder; a GAF of 60; a below average IQ (updated to a borderline IQ of 79 following a
full IQ test on June 11, 2003); and ratings of fair to good on occupational and social adjustment
abilities.  (R. at 173-175.)  Psychologist Dr. Heil adopted Dr. Uran's opinions when he conducted
a Functional Capacity Assessment of Plaintiff on July 31, 2002, and found Plaintiff to be capable
of pursuing substantial gainful activity.  (R. at 195-197.)

---

4.  At the second ALJ hearing, Plaintiff testified that he was still drinking "a couple of six-packs
of beer" per week.  (R. at 298.)

5.  There is no evidence in the record to indicate that Plaintiff received any additional treatment
from Dr. Balestrino despite the ALJ explicitly leaving the record open for 30 days after the first
hearing to allow submission of additional medical evidence.

An unidentified medical consultant, who examined Plaintiff and reviewed his medical records as part of a Residual Physical Functional Capacity Assessment on August 13, 2002, found Plaintiff's only physical impairment to be the seizure disorder and thus Plaintiff's only employment restriction would be to avoid heights.  (R. at 199-204.)

On October 14, 2002, Plaintiff again presented at Butler Memorial Hospital, with a separated left shoulder that he said was the result of a seizure-induced fall, witnessed by an unidentified friend.[6]  Plaintiff was subsequently treated by Dr. Seal, a surgeon who confirmed the shoulder separation.  (R. at 205-206.)

On October 16, 2002, Plaintiff was examined by Dr. Prenatt as part of Plaintiff's application for Pennsylvania Welfare benefits.  Dr. Prenatt, noting both the shoulder injury and the self-reported seizure activity, opined Plaintiff to have been disabled from August 1999 with the possibility of being permanently disabled.  (R. at 240-42.)

Plaintiff's sister, Betty Logan, and her boyfriend, Francis Barnhart, submitted letters stating that Plaintiff experienced seizures at least twice a week from November 2002 through May 2003, supplemented by a list of dates and times of seizures they claim to have witnessed. (R. at 137-141.)  Plaintiff testified during the second hearing that he had been treated at Clarion

---

6.  In her written statement, Plaintiff's sister stated that Plaintiff was instructed at Butler Memorial Hospital to increase his dosage to four times a day because "his Depakote levels were very low" on October 14, 2002, but the Record does not contain any medical records from this Hospital visit that confirm this.  (R. at 137.)  Subsequent medical records from Drs. Seal and Elawar indicate that Plaintiff continued to take Depakote only three times a day, although with a doubling of dosage sometime between October, 2002, and August, 2003.  (R. at 205, 271.)

Hospital in June of 2003, following a seizure experienced at his brother's home, and that "the doctor doubled the dosage from 250 to 500" resulting in fewer seizures.[7]  (R. at 305.)

Plaintiff was seen by a neurologist, Dr. Elawar, on August 26, 2003 at the referral of Dr. Balestrino.  Dr. Elawar examined Plaintiff and spoke with him and with his sister.  Dr. Elawar noted that Plaintiff was taking 500 mg Depakote three times daily and drinking a six-pack twice a week.  Dr. Elawar's "impression" was that Plaintiff had a seizure disorder, so he ordered additional tests and discussed the possibility of follow-up at an epilepsy clinic.[8]  (R. at 271-273.)

At the second ALJ hearing, a vocational expert testified that, based upon the ALJ's hypotheticals, (1) an individual who was limited to simple and repetitive light work activity with additional restrictions of no operation of foot controls, no overhead reaching with non-dominant arm, no more than incidental interaction with the public, no team-type activities, and typical seizure precautions could perform a significant number of jobs; (2) an individual with the same limitations but further restricted to sedentary work would still be able to perform a significant number of jobs; and (3) an individual with a seizure disorder of such frequency and severity as to take him off task for 10-15% of the work day several days a week would be unable to work on a regular and continous basis.  (R. at 313-316.)

Finally, after the second hearing and at the suggestion of his counsel, Plaintiff was seen by Dr. Eisler, a psychiatrist, on June 18, 2004.  Dr. Eisler reported that Plaintiff told him he had

---

7.  There are no medical records from this hospital visit included in the record, but the ALJ stated at the second hearing "I'm satisfied that last June he did have to go to the hospital for a seizure." (R. at 319.)

8.  Plaintiff says he did not follow up with Dr. Elawar or any other neurologist because none of the local neurologists would accept his medical coverage.  (R. at 307.)

dislocated his left shoulder when he slipped on the ice.  Dr. Eisler opined that Plaintiff was

disabled from any gainful employment due to a combination of chronic pain syndrome; seizure

disorder; and resulting Dysthymia, a chronic depressive process.  (R. at 287-290.) This report

was not received by the ALJ until after his second and final decision on the case.

    C.  <u>"Substantial Evidence" Standard of Review</u>

    In reviewing an administrative determination of the Commissioner, the question before

any court is whether there is substantial evidence in the agency record to support the findings of

the Commissioner that the plaintiff failed to sustain his burden of demonstrating that he was

disabled within the meaning of the Social Security Act. 42 U.S.C. § 405(g).  *See also, e.g.,*

*Richardson v. Perales*, 402 U.S. 389 (1971); *Adorno v.  Shalala*,  40  F.3d 43  (3d Cir. 1994).

     More specifically, 42 U.S.C. Section 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript of the
> record, a judgment affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without remanding the cause for a
> rehearing.  The findings of the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive . . . .

    Substantial evidence is defined as "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1000)

(citing *Pierce v. Underwood,* 487 U.S. 552, 565 (1988)); *Plummer v. Apfel*, 186 F.3d 422 (3d

Cir. 1999).  Although there may be contradictory evidence in the record, it is not cause for

remand or reversal of the Commissioner's decision if substantial support exists.  *Sykes v. Apfel,*

228 F.3d 259, 262 (3d Cir. 2000).

D.  Disability Evaluation

The issue before the Court for immediate resolution is a determination of whether there is substantial evidence to support the findings of the Commissioner that the plaintiff was not disabled within the meaning of the Act.

The term "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

The requirements for a disability determination are provided in 42 U.S.C. § 423(d)(2)(A):

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence  . . . 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. Section 423(d)(3).[9]

---

9.  In reviewing a disability claim, the Commissioner must consider subjective symptoms as well as the medical and vocational evidence.  *See Green v. Schweiker,* 749 F.2d 1066, 1068 (3d Cir. 1984) (explaining that "subjective complaints of pain [should] be seriously considered, even where not fully confirmed by objective medical evidence"); *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3d Cir. 1971) ("Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course, the claimant satisfies the requisite burden of proof.").

(continued...)

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine disability. The regulations, published at 20 C.F.R. §§ 404.1501-1529, set forth an orderly and logical sequential process for evaluating all disability claims.[10]  In this sequence, the ALJ must first decide whether the Plaintiff is engaging in substantial gainful activity. If not, then the severity of the Plaintiff's impairment must be considered. If the impairment is severe, then it must be determined whether he meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability. If the impairment does not meet or equal the Listings, then it must be ascertained whether he can do his past relevant work. If not, then the residual functional capacity of the Plaintiff must be ascertained, considering all the medical evidence in the file.[11]

_____

9. (...continued)

In assessing a plaintiff's subjective complaints, the ALJ may properly consider them in light of the other evidence of record, including objective medical evidence, plaintiff's other testimony, and plaintiff's description of his daily activities. *See Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).  And so long as a plaintiff's subjective complaints have been properly addressed, the ALJ's decisions in that regard are subject only to the substantial evidence review discussed in Section C, *supra*. *See Good v. Weinberger*, 389 F. Supp. 350, 353 (W.D. Pa. 1975) (discussing *Bittel* and concluding that where "plaintiff did not satisfy the factfinder in this regard, so long as proper criteria were used, [it] is not for us to question"); *see also Kephart v. Richardson*, 505 F.2d 1085, 1089 (3d Cir. 1976) (noting that credibility determinations of ALJ are entitled to deference).

10. This evaluation process has been repeatedly reiterated with approval by the United States Supreme Court. *See, e.g., Barnhart v. Thomas*, 124 S.Ct. 376, 379-80 (2003).

11. The finding of residual functional capacity is the key to the remainder of findings under the regulations. If the plaintiff's impairment is exertional only, (i.e. one which limits the strength he can exert in engaging in work activity), and if his impairment enables him to do sustained work of a sedentary, light or medium nature, and the findings of age, education and work experience made by the ALJ coincide precisely with one of the rules set forth in Appendix 2 to the regulations, an appropriate finding is made. If the facts of the specific case do not coincide with the parameters of one of the rules, or if the plaintiff has mixed exertional and non-exertional

(continued...)

While these statutory provisions may be regarded as harsh; nevertheless, they must be followed by the courts. *NLRB v. Staiman Brothers*, 466 F.2d 564 (3d Cir. 1972); *Choratch v. Finch*, 438 F.2d 342 (3d Cir. 1971); *Woods v. Finch*, 428 F.2d 469 (3d Cir. 1970). Thus, it must be determined whether there is substantial evidence in the record to support the conclusion of the Commissioner that Plaintiff was not disabled within the meaning of the Social Security Act.

E. Analysis

(1) There is Substantial Evidence to Support the ALJ's Decision.

There is substantial evidence in the record to support the findings of the Commissioner that the Plaintiff failed to sustain his burden of demonstrating that he was disabled within the meaning of the Social Security Act. The ALJ correctly notes that Plaintiff provided no objective medical evidence of his seizure disorder and has demonstrated noncompliance with physician instructions.[12] (R. at 19.) Dr. Davila found Plaintiff was able to lift up to 25 pounds frequently and 100 pounds occasionally, to sit without limitation and to operate hand or foot controls, except with his left leg. (R. at 163-165.) Dr. Uran, the psychologist, found that Plaintiff's IQ is 79 and rated as fair or good his ability to make both social and occupational adjustments. (R. at 179-180, 245.) Both Drs. Balestrino and Elawar each indicated that Plaintiff's seizures should

---

11. (...continued)
impairments, then the rules in Appendix 2 are used as guidelines in assisting the ALJ to properly weigh all relevant medical and vocational facts.

12. Despite medical instruction to stop drinking, Plaintiff told the ALJ and Dr. Elawar that he continued to drink "a couple of six-packs of beer per week" and he told Dr. Seal that he drank alcohol "two to six drinks per day." (R. at 43, 271, 298 and 205.) Despite being told to schedule additional necessary medical tests, Plaintiff failed to do so, even though he acquired medical insurance through Welfare in 2002. (R. at 165, 171, 216, 272.)

be controllable with proper medication.[13]   (R. at 171, 272.)  Drs. Davila and Uran each noted that Plaintiff was seizure free in the weeks leading up to his various appointments with them.  (R. at 163, 173.)  Dr. Heil, a psychologist, and the physician who performed the residual physical functional capacity both found that Plaintiff is capable of pursuing substantial gainful activity. (R. at 197, 199.)  Plaintiff himself testified that he is capable of taking care of his hygiene and other personal needs as well as doing household chores and yard work, including riding a power mower.  (R. at 304.)

Plaintiff raises three specific arguments in his brief, which are addressed below.  Plaintiff requests remand so that the ALJ may consider evidence which Plaintiff submitted after the ALJ's decision; Plaintiff argues that the opinions of three of the physicians who examined him should be given controlling weight on the grounds that they are 'treating physicians;" and Plaintiff questions the ALJ's method for determining Plaintiff's own credibility.  None of these arguments is persuasive.

### (a) New Evidence Does Not Meet the Good Cause Standard for Admittance.

Under the 'substantial evidence' scope of review, the district court is only authorized to review the ALJ's decision based on the evidence that was presented to the ALJ, not based on any evidence subsequently presented to the Appeals Council.  As noted by the Court of Appeals:

> [E]vidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence. ... [The district court is not authorized] to review the Appeals Council decision to deny review [nor] to make a decision on the substantial evidence standard based on the new and material evidence never presented to the ALJ. [The district court may] remand the case to the

_____

13.  When an impairment can be reasonably controlled with medication and treatment, it is not disabling.  *Brown v. Bowen*, 845 F.2d 1211, 1214 (3d Cir. 1988).

> Commissioner, but only if the claimant has shown good cause why
> such new . . . evidence was not presented to the ALJ.

*Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001).  Contrary to this, Plaintiff argues that his case should be remanded for review of Dr. Eisler's report based on sentence six of 42 U.S.C. § 405(g): "The court may ...  at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]"  However, the U.S. Supreme Court ruled that "[u]nder sentence six, the district court may remand in light of additional evidence without making any substantive ruling as to the correctness of the Secretary's decision ... only if the claimant shows good cause for failing to present the evidence earlier."[14] *Melkonyan*, 501 U.S. at 100.  Furthermore, "[s]everal courts have noted Congress' concern that a remand for 'new evidence' without requiring some justification for not having offered the evidence at the initial hearing would turn the procedure into an informal, end-run method of appealing an adverse ruling by the Secretary." *Szubak v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984).[15]

---

14.  The Supreme Court noted "Congress' explicit delineation in § 405(g) regarding the circumstances under which remands are authorized leads us to conclude that it intended to limit the district courts' authority to enter remand orders...." *Melkonyan v. Sullivan,* 501 U.S. 89, 100 (1991).

15.  While *Szubak* was remanded for consideration of new evidence, the Court explicitly based its decision upon plaintiff's lack of counsel prior to the ALJ's decision, combined with five new medical reports presenting considerable new objective medical evidence, creating a situation where "a remand here presents little danger of encouraging claimants to seek after-acquired evidence, and then to use such evidence as an unsanctioned 'backdoor' means of appeal." *Id.* at 835.  Contrast with *Cruz-Santos v. Callahan*, where the court determined plaintiff had not met the good cause requirement even though (1) his current counsel began representation after the ALJ determination and (2) plaintiff had only marginal intellect.  *Cruz-Santos v. Callahan,* No.

(continued...)

Plaintiff's argument that the mere non-existence of Dr. Eisler's report is sufficient to meet the good cause standard is not supported by case law.[16]   For example, in *Ortiz v. Barnhart*, the district court held:

> It is clear that the evidence proffered by claimant is new in that it was prepared after the ... hearing date.  The evidence being proffered ... suggest that plaintiff suffered from a mental disorder that was not a recently acquired disability. However, plaintiff is not excused from her burden of producing available evidence at the hearing. Plaintiff is required to present "some justification for the failure to acquire and present such evidence to the secretary." Since she has failed to meet any of the requirements for the consideration of new evidence, this court concludes that plaintiff's request for remand must be denied."

*Ortiz v. Barnhart*, No. 02-6046, 2004 U.S. Dist. LEXIS 8994 (E.D. Pa. Mar. 25, 2004) (quoting *Szubak*, 745 F.2d at 834).  Plaintiff in the present case was clearly aware of the relevance of psychological reports because there were three such reports from other doctors already in evidence.  In an analogous case, the plaintiff in *Matthews* was not allowed to introduce new evidence as to her arithmetic and reading skills because "Matthews should have known that her ability to work was an issue at the ALJ hearing ... it should have been clear to Matthews that [those] skills were relevant."  *Matthews,* 239 F.3d at 595.  The district court used similar reasoning in *Lopacinski v. Barnhart*:

> [In arguing that he has met the good cause requirement, Plaintiff] states that "much of the evidence did not exist, or at least was [not] known to exist, to Plaintiff's counsel before an ALJ reached a decision." It is

---

15.  (...continued)
97-439, 1998 U.S. Dist. LEXIS 5381 (D.N.J. April 7, 1998).

16.  Nor is it supported by public policy.  "We should encourage disability claimants to present to the ALJ all relevant evidence concerning the claimant's impairments.  If we were to order remand for each item of new and material evidence, we would open the door for claimants to withold evidence from the ALJ in order to preserve a reason for remand."  *Matthews,* 239 F.3d at 595.

> impossible to discern a reasonable meaning of this statement as applied to plaintiff's evidence. It was available at any time. If any of this evidence did not exist, it was because plaintiff simply chose not to obtain it. Even if this court was to generously infer from his response that plaintiff did not understand that psychological evidence could affect the ALJ's determination of his benefits, this would not constitute good cause. First, it would strain credulity to suggest that plaintiff did not know this, considering "mood disorders" was part of his original benefits application.  Second, even if I believed that plaintiff did not understand its importance, this is not good cause because he should have known this.

*Lopacinski v. Barnhart*, No. 01-4364 , 2003 U.S. Dist. LEXIS 7057, *17-20 (E.D. Pa. April 21, 2003).

Nor can Plaintiff in this case plead a lack of time.  Plaintiff had nearly a year between his first and second hearing before the ALJ in which to obtain additional testing and reports.  Indeed, Plaintiff was referred by his attorney to Dr. Uran for an IQ test during that year.  "[Plaintiff] provides no explanation as to why this test could not have been conducted, and the results obtained, in time for the ALJ to consider them. ...  [At] the administrative hearing, [plaintiff] could have specifically requested that the record remain open long enough . . . to obtain the test results, even if they were not available as of the date of the hearing."  *Smith v. Comm'r of Social Security*, 80 Fed. Appx. 268, 270-271 (3d Cir., 2003), affirming denial of remand.  Because Plaintiff has failed to show good cause for not introducing Dr. Eisler's evidence before the ALJ, this Court is constrained from either considering this new evidence itself or remanding the case to the ALJ for consideration.

(b) <u>Treating Physician's Doctrine Does Not Apply.</u>

Plaintiff also errs in arguing that the ALJ failed to give the proper evidentiary weight to the medical opinion of Plaintiff's "treating physicians," Drs. Balestrino, Prenatt and Eisler.[17]  In fact, neither Dr. Prenatt nor Dr. Balestrino qualify as treating physicians under 20 CFR § 404.1502 because neither has "an ongoing treatment relationship" with Plaintiff.[18]  According to the record, Dr. Balestrino only examined Plaintiff once because Plaintiff did not follow his instructions for follow up.  (R. at 171.)  Dr. Prenatt appears to have examined Plaintiff only once as well and for the sole purpose of evaluating him in connection with his Pennsylvania Welfare application.  (R. at 242; *See also* n.17.)  The ALJ is within his right to reject relevant evidence so long as he addresses the specific evidence that is in conflict with his findings.  *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981).

---

17.  Even if Dr. Eisler's report was not excluded due to the "good cause" standard for admitting new evidence, Dr. Eisler is clearly a "nontreating source" because he simply evaluated plaintiff in connection with this claim, and did not suggest any additional treatment. "We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source."  20 CFR § 404.1502.

18.  "Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)." 20 CFR § 404.1502

16

Contrary to Plaintiff's claim that the ALJ ignored the report of Dr. Balestrino, the ALJ included in his decision that Dr. Balestrino noted a lack of objective medical evidence confirming Plaintiff's reported seizures.[19]  (R. at 171.)  While the ALJ did not directly reference Dr. Prenatt's report[20] in his decision, he clearly stated during the first hearing that he would give it "absolutely no probative weight [without] supporting documentation," documentation that the Plaintiff subsequently failed to provide.  (R. at 36.)  The ALJ alone is responsible for determining whether Plaintiff meets the statutory definition of disability; an opinion, even from a medical source that Plaintiff is "disabled" or "unable to work" does not mean the ALJ must agree, especially when that opinion is unsupported by objective medical evidence, as is the situation in this case.  20 CFR § 404.1527(e)(1).

(c) <u>ALJ Properly Determined Credibility of Plaintiff's Testimony</u>

In addition to determining the weight of other evidence, the ALJ is also the one who properly determines the credibility of Plaintiff's own testimony.  The ALJ's observations concerning Plaintiff's credibility during testimony are to be given "great weight" because "he had the opportunity to observe the demeanor and to determine the credibility of the claimant." *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).  Plaintiff's own "statements about ...

---

19.  *See Roddy v. Sec. of HHS*, No. 3:89CV 7653, 1990 WL 166565, *2 (N.D. Ohio July 3, 1990) (noting that where a treating physician's neurological examination was non-focal and he found no abnormalities, "nothing in [that] report indicate[d] the existence of disabling functional limitations of the sort" that would support the physician's assertion that the claimant was disabled).

20.  Dr. Prenatt's report was a single page form, unsupported by any explanatory notes.  "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. . . . [W]here these so-called reports are unaccompanied by thorough written reports, their reliability is suspect. . . ."  *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

pain or other symptoms will not alone establish [disability] ... In evaluating the intensity and persistence of [Plaintiff's] symptoms, [the ALJ will] consider all of the available evidence, including medical history, the medical signs and laboratory findings ..." 20 CFR § 404.1529.

Because Plaintiff's complaint suggested a greater severity of impairment than could be supported by the objective medical evidence, the ALJ applied the appropriate Social Security guidelines[21] in his first decision to evaluate the credibility of Plaintiff's statements, including Plaintiff's own testimony that he manages his personal care and does household chores and yard work.  (R. at 254.)  In his second decision, while the ALJ's explanation of the evaluation process was somewhat more cursory, he still clearly considered the lack of objective medical evidence, the Plaintiff's non-compliance with his physicians' instructions for follow-up testing and treatment, Plaintiff's failure to seek additional relief for seizures he claims are worsening, and the indications of his physicians that the seizures should be controllable with proper medication and follow-up.  (R. at 19;  *See also* n.11.)

The ALJ was within his rights to give less weight to the doctors' medical opinions that were unsupported by clinical findings.[22]  Plaintiff's characterizations of his physicians' records as

---

21.  The ALJ should consider plaintiff's daily activities; location, duration, frequency, and intensity of  pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication for relief of symptoms; treatment or any other measures, other than medication, received for relief of symptoms; and any other factors concerning  functional limitations and restrictions due to pain or other symptoms.  20 CFR § 404.1529.

22.  *See* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).  *See also Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (holding that ALJ may afford physician's opinions more or less weight depending on the extent to which they are supported); *Mason v. Shalala,* 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that doctor's opinions unsupported by objective medical evidence is "weak evidence at best").  *Cf.*  20 C.F.R. § 404.1529(c)(3) (explaining that objective medical evidence

(continued...)

diagnoses notwithstanding, it must be noted that these records consistently and only refer to the subjective reports by Plaintiff and/or his sister[23] of seizure activity.[24]  Indeed, a difficulty the ALJ found with Plaintiff's case was the lack of medical evidence to support Plaintiff's assertion of total disability.  Plaintiff's testimony, even with his physicians' conclusions reiterating that testimony, cannot establish disability without objective evidence.  Moreover, the Commissioner is not required to disprove a claimant's subjective complaints.  The burden remains with the Plaintiff to satisfy the fact-finder that his symptoms are of disabling severity.  *Torres v. Harris*, 494 F.Supp. 297, 300 (E.D. Pa. 1980), *aff'd* 659 F.2d 1071 (3d Cir. 1981).  Plaintiff in this case failed to meet that burden.

(2) ALJ's Determination of Plaintiff's RFC is Supported by Substantial Evidence.

Plaintiff also wrongly argues that there is no substantial evidence supporting the ALJ's finding that Plaintiff is capable of a restricted range[25] of light work because the ALJ did not

---

22.  (...continued)
is that obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of sensory deficits or motor disruption).

23.  In his second decision, the ALJ did not specifically reference the statements by Plaintiff's sister and her boyfriend that Plaintiff had 2-3 seizures/week, but he did indicate during the first hearing his concerns about a lack of corroboration: "I mean I could sit down and write up a list of dates and times, but if there's a lack of corroboration, I'll have to weigh that."  (R. at 38.)

24. Dr. Davila noted "[Plaintiff] claims he has not worked because nobody will hire him due to the history of seizures he has." (R. at 163.)  Dr. Ballestrino noted "[Plaintiff] states these [seizures] occur several times per week." (R. at 171.)  Dr. Elawar noted "according to his sister, [Plaintiff] has had both grand mal and other seizures where he just falls down and his eyes roll back.  They cannot describe it very accurately."  (R. at 271.)

25.  Specifically, the ALJ found "The claimant is capable of simple, repetitive light work that does not require operation of foot controls or overhead reaching with his left arm, exposure to heights or dangerous machinery and no more than incidental contact with the public, no team

(continued...)

include a specific limitation for standing or walking.  Substantial evidence is not necessarily

uncontradicted evidence, but "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing

*Pierce v. Underwood,* 487 U.S. 552, 565 (1988)).  Plaintiff makes much of Dr. Davila's opinion

that Plaintiff was limited to 1-2 cumulative hours of walking or standing per eight hour day.  (R.

at 165.)  However, none of the other physicians who examined Plaintiff indicated any such

specific limitation.  Furthermore, Plaintiff is incorrect in his repeated assertion that Dr. Davila's

opinion is the only one addressing his physical limitations; in fact, Dr. Davila's opinion is

contradicted by the Social Security Administration's examining physician who found Plaintiff

had no exertional limits with regards to standing and walking.  (R. at 199.)  Plaintiff himself

testified that he had not sought medical treatment for his leg since 1989.  (R. at 299.)  Thus,

although contradictory evidence exists, there is substantial evidence in this case for the ALJ's

determination of Plaintiff's residual functional capacity.

    (3) <u>The ALJ Relied on an Appropriate Hypothetical Question</u>.

    Plaintiff's last complaint on appeal is that the ALJ "improperly disregarded the testimony

of the vocational expert ("VE") and relied on an incomplete hypothetical question" because the

---

25.  (...continued)
activities and routine work processes or settings."  (R. at 20.)

ALJ relied on his first question[26] to the VE rather than his last question.[27]  (Pl.'s Br. in Supp. of Summ. J. at 18.)  As Plaintiff concedes, the ALJ is entitled to rely on a hypothetical question posed to the VE that accurately reflects those impairments that are supported by the record.  (Pl.'s Br. in Supp. of Summ. J. at 29.)  *See also Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987).  The ALJ's first question, which included limitations due to a seizure condition, as well as Plaintiff's other impairments that are supported by clinical evidence, is clearly consistent with the rest of his findings.

Again, the ALJ was within his sound discretion to require that Plaintiff's testimony regarding his functional limitations be supported by objective medical evidence.  It is simply insufficient that this testimony is consistent with some of his physicians' conclusory statements which also lacked objective medical substantiation of specific restrictions on Plaintiff's functional capacity sufficient to support a finding of disability under the Act.  *See* 20 C.F.R. § 404.1529(a) (requiring that claimant provide evidence of medical signs and laboratory findings revealing a medical impairment reasonably expected to produce his symptoms).  The record clearly indicates that the ALJ properly considered all evidence, including Plaintiff's testimony regarding the frequency of his seizures.  (R. at 19.)

---

26.  The ALJ's first question specified Plaintiff's age, education and work history and limited Plaintiff to simple and repetitive light work activity with additional restrictions of no operation of foot controls; no overhead reaching with non-dominant arm; no more than incidental interaction with the public; no team-type activities; and "the usual seizure precautions, no heights, dangerous machinery, exposure to scaffolding, any of those things."  (R. at 313.)

27.  The ALJ's last question required the VE to consider an individual with a seizure disorder of such frequency and severity as to take him off task for 10-15% of the work day several days a week.  (R. at 316.)

This is not to say that, had the record been more fully developed by Plaintiff, the ALJ may not have reached a different result.  Nor is it to say that this Court would not perhaps have reached a different result.[28]  It is only to say that under the 'substantial evidence' standard of review by which this Court's consideration of this decision must be constrained, and under the evidence of record as established by Plaintiff prior to the ALJ's issuance of his decision, the ALJ's decision must be affirmed.  There was "such relevant evidence as a reasonable mind might accept as adequate" supporting the ALJ's determination[29] and this Court cannot say as a matter of law that the ALJ erred.

III.  Conclusion

This Court is concerned for Plaintiff.  It can only hope that Plaintiff will make every effort to comply with his doctors' recommendations for testing, monitoring and medication.  It also notes, again, the significant role an absence of supportive objective evidence played in the ALJ's Decision in the case and the availability of an administrative reopening of this case.[30]

Nevertheless, for the reasons discussed above, it appears that the Commissioner's conclusion is supported by substantial evidence.   It further appears that the ALJ made no error of law in his treatment of the medical evidence or in concluding that Plaintiff's testimony concerning the extent of his impairment was not fully credible.  Nor did he fail to proffer to the

---

28.  *See Young*, 2002 WL 34031792, *15 (noting that Court could "not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [it] would have decided the case differently") (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

29.  *Venture v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995).

30.  A claimant "may ask that a final determination ... be reopened ... within two years of the date of the notice [if] new and material evidence is furnished."  *20 CFR 404*.

VE a hypothetical accurately encompassing Plaintiff's specific work-related limitations.  For these reasons, it is recommended that Plaintiff's Motion for Summary Judgment be denied, that Defendant's Motion for Summary Judgment be granted, and that the decision of the Commissioner be affirmed.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, within ten (10) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: July 29, 2005                                     Respectfully submitted,


                                                          s/ Lisa Pupo Lenihan
                                                         LISA PUPO LENIHAN
                                                         United States Magistrate Judge


cc:  Honorable Terrence F. McVerry
     United States District Judge

     Christine M. Nebel, Esq.
     220 South Washington Street
     Butler, PA  16001

     Jessica Lieber Smolar, Esq.
     U.S. Attorney's Office
     700 Grant Street, Suite 400
     Pittsburgh, PA  15219

23